ROB BONTA
Attorney General of California
KATHLEEN BOERGERS
R. MATTHEW WISE
Supervising Deputy Attorneys General
MARNIE G. GANOTIS
VANESSA K. ING
CHRISTOPHER J. KISSEL
JAY C. RUSSELL
ZELDA VASSAR
HARALD H. KIRN
Deputy Attorneys General
State Bar No. 336448
1300 I Street
Sacramento, CA 95814
Telephone: (916) 210-6111
E-mail: Harald.Kirn@doj.ca.gov

*Attorneys for Plaintiff State of California*

*Additional counsel listed on caption page*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

**STATE OF CALIFORNIA; STATE OF MAINE; STATE OF MARYLAND; STATE OF MICHIGAN; STATE OF NEW MEXICO; STATE OF NEVADA; STATE OF OREGON,**

Plaintiffs,

**v.**

**DONALD J. TRUMP**, in his official capacity as President of the United States of America; **UNITED STATES OF AMERICA; RUSSELL T. VOUGHT**, in his official capacity as Director of the U.S. Office of Management and Budget; **U.S. OFFICE OF MANAGEMENT AND BUDGET,**

Defendants.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Administrative Procedure Act Case

## INTRODUCTION

1. President Trump and his Administration continue to wage a relentless campaign to end federal support for policies he disfavors, in willful and persistent defiance of the bounds of the President's lawful authority. To a significant degree, this effort depends on the Administration's spurious and unconstitutional assertion of Executive Branch power over federal spending, at the expense of Congress and our basic constitutional order.

2. The Trump Administration's attempts to unlawfully block the obligation of funding Congress appropriated by statute—known as impoundment—are preventing Plaintiff States from accessing funding opportunities that Congress required the Administration to provide. These funds are vital to Plaintiff States and their residents; Congress's unambiguous intention that they be made available—expressed through appropriations statutes that carry the full force of law—must be respected.

3. The President's obligations with respect to federal spending are manifest from the plain text of the Constitution. The President must "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3. That foundational principle requires the President accept what the fundamental structure of our constitutional democracy demands: The President and the Executive Branch are duty-bound to enforce the appropriations laws Congress has enacted.

4. To state it plainly, the Constitution prohibits impoundment, no matter how it is undertaken. Impoundment violates the separation of powers by contravening several constitutional provisions, including the Spending Clause, the Take Care Clause, and the Presentment Clause. And the impoundment of funding that Congress has previously declined to rescind independently violates the Appropriations Clause.

5. Impoundments are particularly pernicious where, as here, they involve an attempt by the Executive Branch to halt the obligation of certain funds until they expire at the end of the last day of the federal fiscal year: September 30. The intended effect is that those unspent funds are made permanently unavailable to their intended recipients. Given Congress's clear intent that the Executive Branch spend those funds and Congress's exclusive and overriding authority on matters of federal spending, that outcome is blatantly unconstitutional.

6. Nevertheless, the Trump Administration has established a pattern of withholding funds until they expire. For example, the Administration impounded $132 million in funds for the Minority Serving Institutions program past the end of the 2025 fiscal year. Federal agency reports show that those same funds, which Congress appropriated again, could once more be impounded, along with billions appropriated for other programs at the U.S. Department of Education and other agencies like the U.S. Department of Health and Human Services, including the National Institutes of Health.

7. To make matters worse, on September 25, 2026, President Trump announced that he was initiating a so-called "pocket rescission," an attempt to unilaterally rescind $810 million that the Administration had determined—in contravention of Congress's own conclusions—"does not benefit American citizens." The White House, *President Trump Takes Historic Action to Eliminate Wasteful and Harmful Spending* (Sept. 25, 2026).[1] On the same day, President Trump sent a special message to Congress (the "Special Message") purporting to "report 11 rescissions of budget authority, totaling $810 million." A copy of the Special Message is published in the Federal Register at 91 Fed. Reg. 61880 and attached to this Complaint as **Exhibit A** ("Exhibit A").[2]

8. By statute, the President may send a special message to Congress requesting the rescission of appropriated funding; Congress has 45 days to approve or reject the request. 2 U.S.C. § 683. If Congress does not approve the President's request before the 45 days expire, the President *must* spend the funds. A "pocket rescission" is a gambit to depart from this ordered statutory scheme and the clear intent of Congress; according to the President, he need only wait to send a rescission request until very near the end of the fiscal year, such that Congress does not have sufficient time to act on it. On the President's theory, the result is that the funds simply expire before he must expend them. That assertion of unilateral rescission power defies the

[1] Available at https://www.whitehouse.gov/briefings-statements/2026/09/president-trump-takes-historic-action-to-eliminate-wasteful-and-harmful-spending/.

[2] 91 Fed. Reg. 61880 (Sep. 30, 2026); *see also* President's Special Message to Congress, "Rescissions Proposals Pursuant to the Congressional Budget and Impoundment Control Act of 1974," (Sept. 25, 2026), available at https://public-inspection.federalregister.gov/2026-19965.pdf; https://www.whitehouse.gov/wp-content/uploads/2026/09/September-Rescissions-Package-for-Speaker-Johnson_signed-9.25.26.pdf.

Constitution's finely wrought separation of powers.

9. Indeed, the Government Accountability Office—the independent, nonpartisan federal agency charged with auditing the federal government—has already determined that the President's attempted $810 million "pocket rescission" is unlawful. U.S. Gov't Accountability Off. ("GAO") Letter, B-338788, *Impoundment Control Act of 1974: Review of the President's Special Message of September 25, 2026* (Sept. 29, 2026) ("[T]he rescission proposals contained in the President's September 25, 2026, special message to Congress do not permit the President to withhold the appropriations beyond the end of fiscal year 2026.").[3]

10. The facts speak for themselves. The Trump Administration has clearly and repeatedly declared its intent to impound funding appropriated by Congress, including by attempting its "pocket rescission." Now, the Administration has made good on that promise. By this complaint, Plaintiff States seek to prevent that dangerous violation of our country's constitutional order.

11. The Administration has no power to withdraw or diminish the availability of these funds. Its efforts run roughshod over Congress's spending and legislative powers and the requirements of the Presentment and Take Care Clauses. Its attempt to force the funds to expire before they reach Plaintiff States is tantamount to theft.

12. Plaintiff States request the Court exercise its statutory and equitable authority to ensure the funding at issue is obligated according to Congress's intent and to stop the Administration's illegal attempt to push these funds off the fiscal-year cliff.

## JURISDICTION AND VENUE

13. This action arises under the Constitution, the laws of the United States, and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706. This Court has subject matter jurisdiction under 28 U.S.C. § 1331.

14. An actual, present, and justiciable controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court has authority to grant declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202.

[3] Available at https://www.gao.gov/assets/900/890546.pdf.

15. Venue is proper under 28 U.S.C. § 1391(b)(2) and (e)(1) because Plaintiff State of California is a resident of this judicial district and a substantial part of the events or omissions giving rise to this Complaint occurred and continues to occur within this district.

16. This is a civil action in which Defendants are United States agencies or officers sued in their official capacities.

17. Assignment to the San Francisco Division of this district is proper under Northern District of California Local Rules 3-2(c) and (d) because Plaintiff State of California and the United States maintain offices within the district, specifically in San Francisco.

## PARTIES

### Plaintiffs

18. The State of California, represented by and through its Attorney General, Rob Bonta, is a sovereign State of the United States of America.

19. The State of Maine, represented by and through its Attorney General, Aaron M. Frey, is a sovereign State of the United States of America. The Attorney General is authorized to pursue this action pursuant to 5 Me. Rev. Stat. Ann. § 191.

20. The State of Maryland, represented by and through its Attorney General, Anthony G. Brown, is a sovereign State of the United States of America.

21. The State of Michigan, represented by and through its Attorney General, Dana Nessel, is a sovereign State of the United States of America.

22. The State of New Mexico, represented by and through its Attorney General, Raúl Torrez, is a sovereign State of the United States of America.

23. The State of Nevada, represented by and through its Attorney General, Aaron D. Ford, is a sovereign State of the United States of America. The Attorney General is authorized to pursue this action under Nev. Rev. Stat. § 228.110 and Nev. Rev. Stat. § 228.170.

24. The State of Oregon, represented by and through its Attorney General, Dan Rayfield, is a sovereign State of the United States of America.

**Defendants**

25. Donald J. Trump, the President of the United States of America, is responsible for the actions and decisions that are being challenged by Plaintiffs in this action and is sued in his official capacity.

26. The United States of America is responsible for the exercise of executive actions by the named Defendants. The United States of America is included as a Defendant under 5 U.S.C. § 702 to ensure that Plaintiff States obtain adequate relief if this Court enters an injunction.

27. Defendant Russell Vought is the Director of the Office of Management and Budget ("OMB") and that agency's highest ranking official. 31 U.S.C. § 502(a). He oversees OMB and provides direction to the executive branch on financial and budgetary matters. He is sued in his official capacity.

28. Defendant OMB is an agency office within the Executive Office of the President of the United States, 31 U.S.C. § 501, and is an agency within the meaning of 5 U.S.C. § 551(1). OMB is responsible for oversight of federal agencies' performance and the administration of the federal budget as negotiated and passed by Congress. 31 U.S.C. §§ 501–07.

## ALLEGATIONS

### I. FACTUAL BACKGROUND

#### A. The Budget Process

29. The first Monday in February of every year, the President initiates federal budget negotiations by submitting his or her budget request to Congress. 2 U.S.C. § 631; 31 U.S.C. § 1105. Congress provided the President with this role in 1921 as part of an effort to create a unified budget system. Taylor N. Riccard, Cong. Rsch. Serv., R47092, *The Role of the President in Budget Development: In Brief*, May 22, 2025, at 1.[4] The President's budget proposal routinely includes requests to Congress to increase or decrease funding based on his policy agenda. *See id.*

30. Congress uses the President's request as a starting point for its rigorous budgeting process, which culminates in Congress's final budget bill. *Id.* at 6. The President's proposal may

[4] Available at https://www.congress.gov/crs_external_products/R/PDF/R47092/R47092.5.pdf.

help guide Congress's decision-making, but it is in no way binding. *Id.* Like every other statute, Congress's final bill is then presented to the President for signature or veto.

31. The negotiations over the Fiscal Year 2026 budget were particularly complex, as is reflected in Congress's four separate appropriations statutes along with three accompanying continuing resolutions. Pub. L. No. 119–37, 139 Stat. 495; Pub. L. No. 119–74, 140 Stat. 5; Pub. L. No. 119–75, 140 Stat. 173; Pub. L. No. 119–86, 140 Stat. 773. The budget for Fiscal Year 2025 was also highly negotiated, resulting in a lengthy government shutdown and a full-year continuing resolution rather than a new annual appropriations statute. Lida R. Weinstock, et al., Cong. Rsch. Serv., R48832, *The 2025 (FY2026) Government Shutdown: Economic Effects*, Jan. 29, 2026.[5] Each budget process in recent years ultimately resulted in the passage of an appropriations statute signed into law by the President.

32. Appropriations statutes are laws that create "budget authority" by "mak[ing] funds available" to the Executive Branch "for obligation" and "expenditure[s]" for particular purposes, amounts, and periods. 2 U.S.C. § 622(2)(A)(i). An "obligation" is a "definite commitment that creates a legal liability of the government for the payment of goods and services ordered or received, or a legal duty on the part of the United States that could mature into" such a liability. U.S. Gov't Accountability Off., GAO-05-734SP, *A Glossary of Terms Used in the Federal Budget Process*, at 70 (Sep. 1, 2005).[6]

33. After Congress enacts an appropriation, the budget authority it creates passes to the President, to whom Congress delegated the power to "apportion" that authority in the Antideficiency Act. 31 U.S.C. § 1512(b)(1)–(2). The President has, in turn, delegated this apportionment authority to the OMB Director. Exec. Order No. 6166 § 16 (1933).

34. OMB "apportions" that authority to the various federal agencies that are ultimately charged with exercising. The authority is apportioned in installments, staggered throughout the fiscal year, to ensure agencies do not violate the Antideficiency Act by obligating or expending more than Congress appropriated. *See* 31 U.S.C. § 1512. The President and OMB are specifically

---

[5] Available at https://www.congress.gov/crs_external_products/R/PDF/R48832/R48832.2.pdf.
[6] Available at https://www.gao.gov/assets/gao-05-734sp.pdf.

provided with apportionment authority to prevent "obligation or expenditure at a rate that would indicate a necessity for a deficiency or supplemental appropriation," i.e., to effectuate Congress's spending decisions. 31 U.S.C. § 1512(a). OMB may not use its apportionment authority to withhold funds from obligation for policy reasons. *See* 31 U.S.C. § 1512(c)(1) (provides a complete list of circumstances in which OMB may withhold funds).

35. When Congress appropriates funds, those funds come with a timetable. Appropriations laws specify whether funds must be obligated within a single year, within a specific number of years, or by a particular date.

36. In every instance relevant to this suit, Congress specified that the funds at issue were "for the fiscal year ending September 30, 2026," *see e.g.*, Pub. L. No. 119–75, 140 Stat. 174, meaning they must be obligated by September 30, 2026, or they will expire.

37. Critically, appropriations are commands to the Executive Branch to obligate and expend the full amount of money appropriated, absent limiting language not present here. *See, e.g., Train v. City of New York*, 420 U.S. 35, 41–48 (1975); *see also Kendall v. U.S. ex rel Stokes*, 37 U.S. (12 Pet.) 524, 610 (1838).

**B. The Administration's "Quiet Impoundments"**

38. Despite its legal obligation to spend funds in accordance with Congress's directives, the President, through OMB and various agencies, has either refused to spend or failed to spend some of those mandated funds.

39. These "quiet impoundments" are evident from the Administration's own data. OMB and other federal agencies must make their spending actions public. OMB must publish its "apportionments," i.e., its allocations of budget authority to other agencies, on a public-facing website. Consolidated Appropriations Act, 2023, Pub. L. 117–328, div. E, tit. II, § 204(1), 136 Stat. 4667. The transparency requirement was in part motivated by the previous Trump Administration's impoundment of funds appropriated to support the Ukraine in its self-defense. *Citizens for Resp. and Ethics in Wash. v. OMB*, 791 F. Supp. 3d 29, 40 n.4 (D.D.C. 2025). Publication ensures both Congress and the public are aware of the actions taken by OMB. The information is published at apportionment-public.max.gov.

40. The various other federal agencies are required to release its data on Standard Form 133 ("SF 133"). These SF 133s are meant to fulfill a variety of the Executive Branch's reporting and review requirements placed on the Executive Branch. *See, e.g.*, 31 U.S.C. §§ 1511–14, 1554. Agencies publish these documents on a monthly basis. The final SF 133s for Fiscal Year 2026 will be published sometime early in Fiscal Year 2027.

41. Based on the most recent publicly available data, current through August 2026, $379 million that Congress appropriated through the U.S. Department of Education for "Innovation and Improvement," Pub. L. No. 119–75, 140 Stat. 296, remains unobligated. So, too, does $576 million that Congress appropriated for "Injury Prevention and Control" through the U.S. Department of Health and Human Services, Pub. L. No. 119–75, 140 Stat. 264, and at least $132 million, appropriated pursuant to 20 U.S.C. § 1067q, to support minority-serving institutions of higher education.

42. On information and belief, as of the date of today's filing, which is the last day of fiscal year 2026, there is no publicly available indication that all remaining unobligated funding will be obligated before that funding's statutory validity period lapses at midnight. Without announcement, warning, or—critically—legal authority, the Administration is "quietly" impounding these funds, and likely others, by failing or refusing to obligate them prior to their statutory expiration on September 30.

43. These impoundments contravene the will of Congress and deprive the intended beneficiaries, such as Plaintiff States, of vital federal funding opportunities.

44. Unfortunately, none of this should come as a surprise. The Trump Administration has proudly and repeatedly expressed its intent to purposefully impound congressionally appropriated funds. President Trump has "described the impoundment power as 'the secret weapon' to squeezing out 'the bloated federal bureaucracy while still doing everything America needs and more.' 'This constitutional power of the President should never have been curtailed,' the former president added, 'but I will get it back and will use it to stop inflation and bring federal spending under control.'" Philip Wegmann, *Trump Plan To Bypass Congress and Starve "The*

*Deep State,"* RealClearPolitics (June 28, 2023).[7] Director Vought promised to restore the President's impoundment authority in his confirmation hearing.

45. The impoundments at issue here are the latest iteration of President Trump's broader effort to wrest "the most complete and effectual weapon with which any constitution can arm the immediate representatives of the people"—the power of the purse—from the hands of Congress. *The Federalist* No. 58 (James Madison).[8]

**C. The Pocket Rescission**

46. On the evening of September 25, 2026, the Administration announced it was "utilizing a pocket rescission" to unilaterally cut $810 million in "wasteful and harmful government spending that does not benefit American citizens." 91 Fed. Reg. 61880 (Sep. 30, 2026).[9] President Trump sent the Special Message to Congress that same day but that message did not request Congress rescind its prior appropriation as plainly contemplated by statute. Instead, the Special Message "*report[ed]* 11 rescissions of budget authority."[10] The same day, OMB issued a letter for the affected accounts, withholding the amounts proposed for rescission from obligation and purporting to reapportion those amounts to different accounts. 91 Fed. Reg. 61880 (Sep. 30, 2026). This reapportionment purports to effectuate the unlawful pocket rescission, meaning it incorporates the same explicit policy justifications supporting the rescission, outlined in the President's public announcement and the Special Message.

[7] Available at https://www.realclearpolitics.com/articles/2023/06/28/trump_plan_to_bypass_congress_and_starve_the_deep_state__149417.html?callback=in&code=NZIWNJNLYZGTY2NLNS0ZZMVKLTK3ODITNJNJYTMYMMVIZWNM&state=df2e2e0d7f974925baa65c1168af441c.

[8] Available at https://guides.loc.gov/federalist-papers/text-51-60#s-lg-box-wrapper-25493434.

[9] *See also* The White House, *President Trump Takes Historic Action to Eliminate Wasteful and Harmful Spending* (Sept. 25, 2026); Exhibit A. https://www.whitehouse.gov/briefings-statements/2026/09/president-trump-takes-historic-action-to-eliminate-wasteful-and-harmful-spending/.

[10] The White House, *September Rescission Package* (Sept. 25, 2026), https://www.whitehouse.gov/wp-content/uploads/2026/09/September-Rescissions-Package-for-Speaker-Johnson_signed-9.25.26.pdf (emphasis added).

47. Plaintiff States receive and rely upon funding from several of the accounts identified for proposed rescission.[11] Those programs and the amount purportedly rescinded for each include:

48. **$567,401,904, Refugee and Entrant Assistance, Administration for Children and Families, U.S. Department of Health and Human Services ("HHS").** The first purported rescission of budget authority claimed to rescind $567,401,904 meant to support Refugee and Entrant Assistance, which funds Office of Refugee Resettlement programs. These funds are a portion of the $6,327,214,000 that Congress appropriated for Refugee and Entrant Assistance in fiscal year 2024. Pub L. No. 118–47, 138 Stat. 664. They will expire on September 30, 2026, if they are not obligated by that date. *Id.*

49. The appropriation provided funds for programs created under four statutes, one of which—section 501 of the Refugee Education Assistance Act of 1980, codified at 8 U.S.C. § 1522—authorizes the Director of the Office of Refugee Resettlement to make awards to public or private entities for English and job-skills training, as well as other services "where specific needs have been shown." 8 U.S.C. § 1522(c)(1)(A). The funds "shall be allocated among the States" based on the number of new refugees residing there at the beginning of the fiscal year. *Id.* § 1522(c)(1)(B).

50. The appropriation also funds programs that support unaccompanied child refugees, minor victims of human trafficking, and other unaccompanied minors.[12] 8 U.S.C. § 1521 *et seq.*;

---

[11] In addition to the accounts identified herein, the other accounts included in the Special Message are:

1. $15,000,000, Federal Assistance Account, Federal Emergency Management Agency, U.S. Department of Homeland Security (DHS);
2. $10,000,000, Federal Assistance, Citizenship and Immigration Services, DHS;
3. $15,000,000, Salaries and Expenses, Community Relations Service, Legal Activities and U.S. Marshals, U.S. Department of Justice;
4. $8,704,713, Debt Restructuring, Multilateral Assistance, International Assistance Programs;
5. $56,100.000, Housing Counseling Assistance, Housing Programs, U.S. Department of Housing and Urban Development; and
6. $10,000,000, Minority Business Development, Minority Business Development Agency, U.S. Department of Commerce.

[12] *See* Off. of Mgmt. & Budget, Exec. Off. of the President, *Refugee and Entrant Assistance Apportionment*, File ID 14483656 (Approved Nov. 18, 2025), available at https://openomb.org/file/11483656.

8 U.S.C. § 1232; 6 U.S.C. § 279. These programs provide federal funds to assist States and other entities with ensuring unaccompanied minor refugees receive the services and care they need.

51. Of those funds, $141 million has not been obligated, despite the funds' September 30, 2026, expiration date, according to data that is recent as of the end of August 2026.[13] Additionally, approximately $426 million has been obligated, in part, for formula awards made specifically to States. Together, those two amounts are roughly equal to the $567,401,904 pocket-rescission amount.

52. **$24,907,509, Education for the Disadvantaged, Office of Elementary and Secondary Education, U.S. Department of Education.** The fourth purported rescission claimed to rescind $24,907,509 appropriated to support Special Programs for Migrant Students. Among the programs supported by these funds are the Education for Migratory Children program, which provides formula awards to States to ensure that children of migratory farm workers get the support necessary to meet the same educational expectations as non-migratory children. 20 U.S.C. § 6391 *et seq.* These funds also support the High School Equivalency Program and the College Assistance Migrant Program which are high school equivalency and college assistance programs for migratory and seasonal farmworkers. 20 U.S.C. § 1070d-2.

53. **$69,588,896, Higher Education, Office of Postsecondary Education, U.S. Department of Education.** The eighth purported rescission claimed to rescind $69,588,896 appropriated for International Education and Foreign Language—Domestic Programs. These funds support domestic programs that provide grants to institutions of higher education and individuals to strengthen instruction in foreign languages, area studies, and other international studies. 20 U.S.C. § 1121 *et seq.* Examples of such programs include the National Resource Centers, Foreign Language and Area Studies Fellowships, Language Resource Centers, Undergraduate International Studies and Foreign Language, Centers for International Business Education, and Centers Aligned with Areas for National Need. *See* 20 U.S.C. §§ 1122, 1123,

[13] U.S. Dep't of Health and Human Services, Standard Form 133 Report on Budget Execution and Budgetary Resources: 75-1503 24/26 Refugee and Entrant Assistance (FY 2026), available at: https://portal.max.gov/portal/document/SF133/Budget/FY%202026%20-%20SF%20133%20Reports%20on%20Budget%20Execution%20and%20Budgetary%20Resources.html.

1124. The Administration requested a $2 billion reduction to Higher Education funding for fiscal year 2026. Congress increased the appropriation instead. The Administration requested a nearly $3 billion cut for fiscal year 2027, which Congress has not adopted.

54. **$27,700,000, Healthcare Research and Quality, Agency for Healthcare Research and Quality ("AHRQ"), HHS.** The ninth purported rescission claimed to rescind $27,700,000 appropriated for the AHRQ. This agency is dedicated to health services research and works to enhance the quality, safety, affordability, and accessibility of health services. 42 U.S.C. § 299 *et seq*. Congress directed that AHRQ "shall" promote health care quality improvement by conducting and supporting research regarding all aspects of health care, including by awarding grants. 42 U.S.C. § 299a. In doing so, the agency is directed to conduct and support research with respect to inner city and rural areas, health care for priority populations such as minority groups, and minority health disparity populations. 42 U.S.C. §§ 299, 299a-1. The Administration requested that Congress eliminate Healthcare Research and Quality funding for fiscal year 2026. Congress declined. For fiscal year 2027, the Administration requested Congress eliminate the funding again. Congress has not done so, again.

55. **$5,098,000, Office of the Secretary, Departmental Management, HHS.** The eleventh purported rescission claimed to rescind $5,098,000 appropriated to the Office of Minority Health ("OMH"). This office, originally established in 1986, exists "for the purpose of improving minority health and the quality of health care minorities receive, and eliminating racial and ethnic disparities." 42 U.S.C. § 300u-6(a). Congress directed that the office "shall" award grants and cooperative agreements to "assure improved health status of racial and ethnic minorities." *Id.* The office also supports a number of programs, such as training healthcare professionals to provide culturally competent care, *see id.* §§ 300u-6(a), (b)(10), (d)(3), and has housed the OMH Resource Center and Knowledge Center, which provides health literature and research, for over 30 years.

56. While the Administration has announced its "pocket rescission" impoundments and attempted to describe them as authorized by the Impoundment Control Act, they are no different from the quiet impoundments discussed in the prior section. The Administration is

impounding these funds without legal justification or authority, and by doing so is frustrating the will of Congress and injuring the intended recipients, including Plaintiff States.

## II. Legal Background

### A. The Constitution Provides Congress Exclusive Power over Federal Spending and Legislation

57. The Constitution vests all legislative powers in Congress and prescribes the procedure by which laws may be enacted. U.S. Const. art. I, § 1; U.S. Const. art. I, § 7, cls. 2, 3.

58. That legislative procedure includes the requirements of bicameralism and presentment. U.S. Const. art. I, § 7, cls. 2, 3. Bicameralism provides that all laws be enacted with the approval of both Houses of Congress. *INS v. Chadha*, 462 U.S. 919, 948–49 (1983). Presentment requires that the proposed law passed by Congress be presented to the President for signature or veto. U.S. Const. art. I, § 7, cls. 2, 3.

59. When the President is presented with a bill both houses of Congress have passed, the President may sign the bill into law, veto it in its entirety, or take no action on it for a period of ten days, after which time it becomes law. U.S. Const. art. I, § 7, cl. 2. The President's formal role "in determining the final text of what may become a law" extends no further than this process, *Clinton v. City of New York*, 524 U.S. 417, 449 (1998), which is the "finely wrought and exhaustively considered" procedure imposed by our Constitution to enforce the separation of powers, *Chadha*, 462 U.S. at 951.

60. The President may not repeal, modify or ignore the statutory directives of Congress. *Clinton*, 524 U.S. at 446–49; *Kendall*, 37 U.S. (12 Pet.) at 610-13.

61. The Constitution also provides Congress the exclusive "power of the purse." *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018). "The power over the purse was one of the most important authorities allocated to Congress in the Constitution's 'necessary partition of power among the several departments.'" *U.S. Dept. of Navy v. Fed. Labor Rel. Auth.*, 665 F.3d 1339, 1346-47 (D.C. Cir. 2012) (Kavanaugh, J.) (quoting *The Federalist* No. 51 (James Madison)). The "power of the purse" principally arises from two provisions of the Constitution that are particularly relevant here: the Spending and Appropriations Clauses.

62. The Spending Clause grants Congress authority "[t]o . . . provide for the common Defence and general Welfare of the United States," and provides Congress the affirmative authority to direct federal spending. U.S. Const. art. I, § 8, cl. 1.

63. The Appropriations Clause, in contrast, is a limitation that provides that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7. Given Congress's exclusive authority to legislate, and its authority to spend, the Appropriations Clause ensures that Congress's control of spending is, and remains, exclusive.

64. Together, these clauses ensure federal dollars are spent in accordance with the judgments of Congress—the part of the federal government closest to the people. *U.S. Dept. of Navy*, 665 F.3d at 1347. Both are necessary components of Congress's power of the purse, which is, in turn, essential to the separation of powers. *Id.*

65. Separately, the Constitution imposes a duty to "take Care that the Laws be faithfully executed" on the President. U.S. Const. art. II, § 3. The Take Care Clause requires the Executive to respect Congress's legislative authority. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952) ("In the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker.").

66. The President's authority under the Take Care Clause "starts and ends with the laws Congress has enacted." *Id.* at 633 (Douglas, J., concurring) (internal quotation omitted). The duty to faithfully execute the laws passed by Congress is the President's "most important constitutional duty." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 577 (1992). That same duty runs to "the subordinate executive agencies." *In re Aiken County*, 725 F.3d 255, 259 (D.C. Cir. 2013) (Kavanaugh, J.).

67. Critically, the duty to faithfully execute the laws does not include a dispensing power—i.e., the power to *not* execute the laws of Congress in certain situations. *Kendall*, 37 U.S. (12 Pet.) at 610-13. The absence of a "dispensing power," *see Kendall*, 37 U.S. (12 Pet.) at 613, means that "the President must follow statutory *mandates* so long as there is appropriated money available" and "may not decline to follow a statutory mandate or prohibition simply because of

policy objections." *In re Aiken County*, 725 F.3d at 259. These are "bedrock principles." *Id.*

68. Put another way, Congress's appropriations are not suggestions. Appropriations are laws enacted under Congress's legislative authority to give effect to its decisions regarding which spending supports the general welfare. *Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n of Am.*, 601 U.S. 416, 426–27 (2024) ("*CFPB*")."); *South Dakota v. Dole*, 483 U.S. 203, 206–07 (1987). That the Executive Branch spend the money Congress has allocated is a mandatory condition.

69. When Congress wishes to give the Executive Branch discretion to spend less than the full amount appropriated, Congress is explicit—stating, for example, that an agency is appropriated "sums not exceeding" or "up to" a specific amount. *See, e.g.*, *CFPB*, 601 U.S. at 442–43 (Kagan, J., concurring). Without such language, appropriations require the Executive to spend the full amount of the appropriation. *See, e.g.*, *Train*, 420 U.S. at 41–48 (rejecting a federal agency's argument that it had discretion to spend less than the full amount specified for a particular program); *see also Kendall*, 37 U.S. (12 Pet.) at 610.

**B. Various Statutes Reinforce the Constitutional Framework**

70. Congress has buttressed its control over federal spending by enacting a framework of overarching statutes and controls, which either explicitly restate or plainly assume the constitutional framework outlined above.

71. Among these is the so-called "purpose statute," which states that "[a]ppropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law," 31 U.S.C. § 1301(a)—repeating the combined command of the Appropriations Clause and Take Care Clause that the President may only spend funds as directed by Congress.

72. Congress also enacted the Antideficiency Act, 31 U.S.C. § 1341, and the Congressional Budget and Impoundment Control Act of 1974 ("ICA"), 2 U.S.C. § 682 *et seq.*, which reaffirm that only Congress can rescind or reduce the funding it has appropriated. The Antideficiency Act further criminalizes the spending of federal money without a Congressional appropriation. 31 U.S.C. §§ 1517–19.

73. Relevant here, Congress—through the ICA—has chosen to allow the President to

transmit a special message requesting the rescission of funds. 2 U.S.C. § 683(a). So, although nothing in the Constitution provides the President with the power to *rescind* funds on his own, Congress—pursuant to its legislative authority—has provided the President with a formal mechanism to *request* appropriations adjustments, subject to a number of procedural protections.

74. Chief among them is that, for any of the President's requested rescissions to be implemented, the President must first ask Congress to adjust its previous statutory appropriations, and Congress must then pass a rescission bill that adopts all or part of the amount the President proposed to be rescinded. 2 U.S.C. §§ 682(3), 683(b). Congress must do so before the end of the first 45-calendar-day period of continuous session after the date of the President's message. *Id.*

75. Importantly, unless Congress passes a rescission bill within the prescribed 45-day period, the funds that the President requested to rescind "shall be made available for obligation[.]" 2 U.S.C. § 683(b). The text of the ICA is clear: the *only* mechanism that permits budget authority to be permanently withheld is Congress's passage of a rescission bill. *See id.*; *see also* GAO Decision B-330330.1, *Impoundment Control Act—Withholding of Funds through Their Date of Expiration* (Dec. 10, 2018).[14] In other words, even in the context of the ICA, Congress has affirmed that it alone has the final constitutional authority to appropriate federal dollars.

76. Congress has also included a provision in its appropriations for each fiscal year for at least the last ten years that no federal funds may be used to give effect to the President's budget request unless Congress adopts it. Specifically, the provision states:

> None of the funds made available in this or any other appropriations Act may be used to increase, eliminate, or reduce funding for any program, project, or activity as proposed in the President's budget request for a fiscal year until such proposed change is enacted in an appropriation Act, or unless such change is made pursuant to the reprogramming or transfer provisions of this or any other appropriations Act.
>
> Pub. L. No. 119–75, 140 Stat. 502.

This statute accordingly deprives the Executive Branch of authority to use *any* federal funds to modify the spending level for a program it has requested that Congress change. It is relevant here for three reasons. **First**, it reaffirms that the President is bound to the funding determinations of

[14] Available at https://www.gao.gov/assets/b-330330.1.pdf.

Congress. **Second**, it renders any impoundment an Appropriations Clause violation, because to pay for the federal activities required to effectuate the budget request, the Administration must spend money that Congress expressly told it not to spend. **Third**, it renders the impoundment a violation of the Antideficiency Act.

77. Nevertheless, the Administration is trying to run out the clock and to force the rescission of funds, on the theory that it can transform Congress's appropriations into mere suggestions.

78. By refusing to spend those federal funds as appropriated, the Administration violates the separation of powers, the Appropriations Clause, underlying appropriations statutes, and various other statutory provisions.

### C. These Impoundments Violate the Constitution

#### 1. Separation of Powers

79. The Administration's use of both quiet impoundments and its attempted "pocket rescissions" usurp Congress's core powers and undermine our constitutional order.

80. The President's authority to act "must stem either from an act of Congress or from the Constitution itself." *Youngstown*, 343 U.S. at 585. The President's power is at its apex when acting pursuant to express or implied authorization of Congress. *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 10 (2015). And it is "when 'the President takes measures incompatible with the expressed or implied will of Congress . . . [it is] at its lowest ebb.'" *Id.* (quoting *Youngstown*, at 637–38 (Jackson, J. concurring)). In those circumstances the President "can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter" which "must be both 'exclusive' and 'conclusive' on the issue." *Id.* (quoting *Youngstown*, 343 U.S. at 637–38). If the President acts without that exclusive constitutional authority, then that action violates the separation of powers.

81. The President and his Administration lack both constitutional and statutory authority to impound the funds at issue.

82. No statute authorizes President Trump to impound any amount of the appropriations here. Rather, Congress has directed that these funds must be obligated in the

amount and for the purposes it has specified, and they must be obligated before the end of this fiscal year. For example, Congress appropriated $345 million to the Healthcare Research and Quality account to carry out titles III and IX of the Public Health Services Act, part A of title XI of the Social Security Act, and section 1013 of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 in Fiscal Year 2026. Pub. L. No. 119-75, 140 Stat. 272. This imposes a duty on the President to spend $345 million on the programs contained in those program statutes for Fiscal Year 2026. It does not provide discretion to do otherwise.

83. The President attempts to exercise two powers by impounding these funds—the power over the federal purse and the power to amend legislation—that the Constitution commits to Congress's exclusive control. *San Francisco*, 897 F.3d at 1233–34. Courts have already resoundingly rejected the existence of any Executive Branch authority in either space. *See, e.g.*, *Dep't of the Navy v. Fed. Lab. Rel. Auth.*, 665 F.3d 1339, 1347 (D.C. Cir. 2012) ("If not for the Appropriations Clause, the executive would possess an unbounded power over the public purse of the nation; and might apply all its monied resources at his pleasure.") (citing 3 Joseph Story, *Commentaries on the Constitution of the United States*, § 1342, at 213-14 (1833)).

84. "Simply put, 'the President does not have unilateral authority to refuse to spend the funds.'" *San Francisco*, 897 F.3d at 1232 (quoting *In re Aiken County*, 725 F.3d at 261 n.1). The Constitution does not empower him to impound by neglecting his duty to execute the spending priorities of Congress, and it certainly does not provide constitutional authority to affirmatively rescind $810 million in appropriations based on his policy preferences.

85. Thus, the President and his Administration violate the separation of powers by impounding the funds at issue.

86. If the President could spend any amount less than Congress appropriates, it would reduce Congress's statutory appropriations to mere recommendations. This would eliminate the annual policy negotiation between the Executive and Congress at the center of our government. Instead, the President could accept whatever funds go to his preferred programs and simply refuse to fund any disfavored programs. This is not what the Framers intended.

87. In fact, the Supreme Court has already rejected a similar theory. In *Clinton v. City*

*of New York*, the Court considered the Line Item Veto Act which in effect allowed the President to cancel portions of statutes while the remainder "continue[d] to have the same force and effect as they had when signed into law." *Clinton*, 524 U.S. at 438. The Court held that the Line Item Veto Act was unconstitutional, and the broad authority it purported to provide to repeal portions of statutes was non-delegable. *Id.* at 448.

88. The President's purported use of a "pocket rescission" further underscores the constitutional infirmity of the Administration's view. Director Vought stated recently in a televised interview that a "pocket rescission . . . allows us to send something as a notification and the money evaporates."[15] With just five days left of the federal fiscal year, the President reported "11 rescissions of budget authority, totaling $810 million" purportedly "in accordance" with section 683(a) of the ICA. 91 Fed. Reg. 61880; *see also* Exhibit A. But that section, which was enacted to *prevent* impoundments, merely allows the President to request "the amount of budget authority which he *proposes* to be rescinded[,]" leaving the ultimate decision of rescission with Congress. 2 U.S.C. § 683(a)(1). If Congress does not pass a rescission bill within the 45-day period granting the President's request, the President must make the funds available. *Id.* § 683(b). That framework preserves the separation of powers.

89. The Administration suggests that this 45-day period, during which Congress may review the request, triggers an automatic deferral of the funds, which the Administration then argues it can use to delay the obligation of funds past their statutory expiration date. The result is an unlawful impoundment and the effective repeal of portions of appropriations statutes. This transforms a process meant to allow Congress to review and act on the President's requests into a mechanism for circumventing Congress's review and intent. In so doing, it deprives Congress of its exclusive control over federal spending. This interpretation runs counter to the plain language of the ICA and the Constitution's carefully considered separation of powers.

[15] Acyn (@Acyn), X (Sept. 28, 2026, 1:32 PM), https://x.com/Acyn/status/2104670616838410457.

**2. Appropriations Clause**

90. The Appropriations Clause provides that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7. The federal government runs on appropriations, which fund everything from federal programs to the personnel and equipment needs of each agency.

91. When Congress provided appropriations to the relevant agencies for this fiscal year, it attached specific conditions governing their use.

92. One such condition prohibits the use of *any* appropriation to support an effort to change the funding level of any program to conform to a Presidential budget request that Congress rejected. *See, e.g.*, Pub. L. No. 119–75, 140 Stat. 502, § 739.[16] Thus, any use of federal resources in support of the President's effort to quietly impound or "pocket rescind" funding violates the Appropriations Clause.

93. The Administration is seeking to eliminate funds to better reflect the President's preferred funding levels as reflected in his budget request, despite Congress previous rejection of the cuts the President had requested. Here, Refugee and Entrant Assistance, Education for the Disadvantaged, and Higher Education are all appropriations that the President requested be reduced or eliminated in FY26. For each, Congress declined to adopt the proposed change. The Administration requested these same accounts, plus Healthcare Research and Quality, be cut or eliminated for FY27. Congress again refused to adopt the proposed change.

**D. Administrative Procedure Act**

94. Defendants' impoundments also violate the relevant appropriations statutes and other statutory controls that enforce Congress's plenary control over federal spending.

95. Defendant OMB's actions are subject to the Administrative Procedure Act. 5 U.S.C. § 701(b).

96. In failing to obligate funds that Congress has appropriated, Defendants subvert

[16] The statute states: "None of the funds made available in this or any other appropriations Act may be used to increase, eliminate, or reduce funding for a program, project, or activity as proposed in the President's budget request for a fiscal year until such proposed change is subsequently enacted in an appropriation Act, or unless such change is made pursuant to the reprogramming or transfer provisions of this or any other appropriations Act."

Congress' clear directives and violate the underlying appropriations statutes that fund these programs. A reviewing court must "hold unlawful and set aside agency action" that is "not in accordance with law," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A)–(C).

97. "[A]n appropriation is simply a law that authorizes expenditures from a specified source of public money for designated purposes." *CFPB*, 601 U.S. at 424. It is a "settled, bedrock principle[]" that the President must follow "statutory *mandates* so long as there is appropriated money available and the President has no constitutional objection to the statute." *In re Aiken County*, 725 F.3d at 259. Likewise, "the President may not decline to follow a statutory mandate or prohibition simply because of policy objections." *Id.*

98. None of the relevant provisions of the relevant appropriations acts that authorize the funding at issue indicate that Congress intended to grant the Executive Branch discretion to spend less than the full amount appropriated.

99. Longstanding historical practice also confirms that the President has no authority to unilaterally revise congressional appropriations. The Comptroller General, the top legislative-branch official charged with oversight of federal expenditures, has explained in opinions since at least 1973 that "[t]he Constitution grants the President no unilateral authority to withhold funds from obligation." *In re Office of Management and Budget—Withholding of Ukraine Security Assistance*, B-331564, 2020 WL 241373, at *4 (Comp. Gen. Jan. 16, 2020).

100. Despite that, the Administration is withholding an untold amount of funds by refusing to obligate them, via both secret maneuvers that it hopes no one will notice, and via an announced "pocket rescission" for overtly politicized funding. Regardless of the method, the result is the same: The failure to obligate violates Congress's clear direction to spend. If the Executive Branch wishes to avoid spending funds that have been lawfully appropriated, it must follow the procedure created by Congress for proposing rescissions to Congress. *See* 2 U.S.C. §§ 683, 684; 31 U.S.C. §§ 1301(a), 1512(c)(1). That procedure has not been followed here.

101. Here, Defendants have baldly refused to carry out the requirements of the appropriations acts by failing to obligate funds within the mandated timeframe as directed by

Congress. They have also subverted Congress's appropriations in favor of their own spending priorities, used OMB's apportionment authority to effectuate policy goals, spent federal funds without authorization, and manipulated statutory processes to evade congressional review. In doing so, Defendants have acted in excess of their statutory authority and "not in accordance with" a variety of statutes, including numerous appropriations acts, the Anti-deficiency Act, the purpose statute, and others.

## III. THE PLAINTIFF STATES ARE HARMED BY THE IMPOUNDMENTS

102. Defendants' unlawful actions are inflicting harm on the Plaintiff States, which rely on appropriations to support numerous State functions and provide services of vital importance to their residents.

103. Plaintiff States reasonably rely on these funds once Congress has stated clearly that they shall be made available. Plaintiff's reliance on these funds has only increased based on the Executive Branch's historic pattern of compliance with the Constitution when administering federal funding programs. As just one example, Congress appropriated funds to be distributed by the Administration to the Plaintiff States for higher education, health surveillance, and public health programs—funds that the data reflected in SF 133s suggest the Administration intends to leave unspent in defiance of congressional intent.

104. Plaintiff States rely on congressional appropriations to provide services of vital importance to the States themselves and the public at large. The Plaintiff States will have to curtail or terminate important State functions due to these impoundments.

105. Whether these funds are obligated pursuant to a formula or statutory mandate, or part of a competitive process, the Administration's impoundments have effectively eliminated some of Plaintiff States' access to significant funding streams—and in doing, they deprive the people of those States of the benefits Congress intended to provide, such as a lower number of opioid overdoses, improved infrastructure security, expanded access to higher education, and enhanced public health.

106. The Administration's purported "pocket rescissions" create similar harms. Plaintiff States receive and rely upon funding from several of the accounts identified for proposed

rescission, including certain unobligated funds. The rescission presents a particular risk for direct funds to States appropriated for Refugee and Entrant Assistance. The Special Message purported to rescind HHS's authority to obligate $567,401,904 for Refugee and Entrant Assistance. But currently there is only $141 million unobligated in the Refugee and Entrant Assistance account. The remaining funds—approximately $426 million—that the Administration says it is rescinding must, accordingly, be obligated funds. And indeed, the existing obligations in the account that have not been paid are worth approximately $426 million, including an award with $39 million in still-available funds for California. Yet the Administration cannot effectively rescind any obligations via the Special Message.

107. This would not be the first time that the Administration attempted to rescind obligated funds contrary to the will of Congress. In 2025, the Administration terminated approximately $7 billion in Solar for All grants after Congress rescinded "*unobligated*" funds made available to carry out that program, even though Congress "made clear" that "existing grants were not to be rescinded." *Rhode Island AFL-CIO v. EPA*, No. 1:25-CV-00510, 2026 WL 2797310, at *2 (D.R.I. Sept. 18, 2026) (quoting Pub. L. No. 119-21, § 60002, 139 Stat. 154 (2025)) (emphasis added).

108. Regardless of whether the Administration terminates the existing obligations, or uses creative budgeting to hit its rescission target, the impact will be the same. The funds available for ORR Refugee programs will decrease by $569 million. The formula grants supported by these funds guarantee every State a portion of these funds. 8 U.S.C. § 1522. The President's impoundment makes the overall fund smaller, meaning each portion, each award, will decrease as well—harming the States. While the reductions could appear immediately, or in future awards, they will certainly appear, and Plaintiff States will have that much less federal support to give their refugee and unaccompanied minor populations the services they need.

## CLAIMS

## COUNT I

### Violation of Separation of Powers

### (Against All Defendants)

109. Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs.

110. Federal courts possess the power in equity to "grant injunctive relief . . . with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326-27 (2015). Federal district courts have a long history of providing equitable relief when a plaintiff is harmed by an executive official acting unconstitutionally. *See, e.g.*, *Youngstown*, 343 U.S. at 583–84. Suits alleging that a federal official violated the Constitution and seeking equitable relief are not "against the sovereign" and therefore are not barred by sovereign immunity. *E. V. v. Robinson*, 906 F.3d 1082, 1090–91 (9th Cir. 2018) (citing *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 687–90 (1949)).

111. The Constitution "grants the power of the purse to Congress, not the President." *San Francisco*, 897 F.3d at 1231; *see* U.S. Const. art. I, § 9, cl. 7 (Appropriations Clause); U.S. Const. art. I, § 8, cl. 1 (Spending Clause). "Among Congress's most important authorities is its control of the purse." *Biden v. Nebraska*, 600 U.S. 477, 505 (2023). "The Appropriations Clause is thus a bulwark of the Constitution's separation of powers among the three branches of the National Government." *U.S. Dep't of Navy*, 665 F.3d at 1347 (Kavanaugh, J.).

112. Congress also possesses exclusive power to legislate. Article I, Section 1 of the Constitution states that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives." U.S. Const. art. I, §1; *Clinton*, 524 U.S. at 438 ("There is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes."). Appropriations are laws that "authorize[] expenditures from a specified source of public money for designated purposes." *Consumer Fin. Prot. Bureau*, 601 U.S. at 424.

113. For its part, the Executive Branch must "take Care that the laws be faithfully executed." U.S. Const. Art. II, § 3; *Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 327 (2014) ("Under our system of government, Congress makes laws and the President . . . faithfully executes them."). The Executive Branch violates this clause when it declines to execute or otherwise impedes statutes enacted by Congress and signed into law. *See In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 551 (D.C. Cir. 1999) ("[T]he President is without authority to set aside congressional legislation by executive order. . . ."); *Kendall*, 37 U.S. (12 Pet.) at 613 (rejecting argument that by charging the President with faithful execution of the laws, the Take Care clause "implies a power to forbid their execution").

114. Consistent with these principles, the President acts at the lowest ebb of his constitutional authority when he acts contrary to the will of Congress by attempting to unilaterally decline to spend appropriated funds. *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring); *In re Aiken Cnty*, 725 F.3d at 261 n.1 (Kavanaugh, J.) ("[E]ven the President does not have unilateral authority to refuse to spend . . . funds.").

115. The actions at issue here, including the Administration's attempts at "pocket rescission," are expressly designed to eliminate funding appropriated by Congress.

116. No statute even purports to grant the Administration the power to unilaterally eliminate appropriated funding, and indeed none could. The Constitution forbids the Executive Branch from refusing to obligate or spend money appropriated by Congress. Only Congress possesses that authority.

117. By unilaterally refusing to spend appropriated funds without authorization from Congress, the Executive Branch violates the separation of powers.

118. Under 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that the impoundments at issue in this case, including those effectuated under the guise of "pocket rescission," violate the separation-of-powers doctrine. Plaintiff States are further entitled to a permanent injunction preventing Defendants from maintaining the impoundments, including through any actions implementing the impoundments.

**<u>COUNT II</u>**

**Violation of the Appropriations Clause**

**(Against All Defendants)**

119. Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs.

120. Federal courts possess the power in equity to "grant injunctive relief . . . with respect to violations of federal law by federal officials." *Armstrong* , 575 U.S. at 326-27. Federal district courts have a long history of providing equitable relief when a plaintiff is harmed by an executive official acting unconstitutionally. *See, e.g.*, *Youngstown*, 343 U.S. at 583–84. Suits alleging that a federal official violated the Constitution and seeking equitable relief are not "against the sovereign" and therefore are not barred by sovereign immunity. *E. V. v. Robinson*, 906 F.3d 1082, 1090–91 (9th Cir. 2018) (citing *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 687–90 (1949)).

121. The Appropriations Clause provides that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7. That means that the Executive Branch may not expend funds except pursuant to a Legislative Branch appropriation. Every appropriations law for the past ten years has included a provision that specifically prohibits the Executive Branch from expending funds in furtherance of eliminating or reducing funding that Congress has, after the President's prior request, declined to eliminate or reduce. Pub. L. No. 119–75, 140 Stat. 492. For the 2026 fiscal year, President Trump requested deep cuts—and even elimination of all funding—to several accounts, including Refugee and Entrant Assistance, Higher Education, and Healthcare Research and Quality. Congress either declined to go as far as the President requested or ignored the President's request altogether.

122. The September 25 Special Message announced rescissions of $567,401,904 for Refugee and Entrant Assistance; $24,907,509 for Education for the Disadvantaged; $69,588,896 for Higher Education; and $27,700,000 from Healthcare Research and Quality, amongst others. Each of these unlawful rescissions is a clear effort to make federal spending more closely resemble the budget request that Congress rejected.

123. Any federal funds expended to prepare these rescissions—including, for example, the cost of printing the September 25 Special Message—were accordingly "drawn from the Treasury" but without the approval—and indeed against Congress's express command that funds not be used to "increase, eliminate, or reduce funding for any program, project, or activity as proposed in the President's budget request for a fiscal year until such proposed change is enacted in an appropriation Act." Pub. L. No. 119–75, 140 Stat. 492.

124. Under 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that the preparation of the Special Message violated the Appropriations Clause. Plaintiff States are further entitled to a permanent injunction preventing Defendants from taking any action to implement the Special Message.

**COUNT III**

**Violation of the Presentment Clause**

**(Against All Defendants)**

125. Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs.

126. Federal courts possess the power in equity to "grant injunctive relief . . . with respect to violations of federal law by federal officials." *Armstrong*, 575 U.S. at 326-27.

127. The Constitution prescribes a "single, finely wrought and exhaustively considered[] procedure" for enacting legislation: passage of a bill by both houses of Congress and presentment to the President for his signature or veto. *Clinton*, 524 U.S. at 439–40 (quoting *Chadha*, 462 U.S. at 951); *see* U.S. Const. art. I, § 7, cls. 2, 3.

128. This procedure is an exclusive one. Therefore, the Administration's actions to unilaterally decline to expend funds and to unilaterally rescind funding via its purported "pocket rescission" violate the Presentment Clause, as they constitute an attempt "to enact, to amend, or to repeal [appropriations]" that the Executive Branch dislikes without following the "finely wrought" procedures for doing so. *Clinton*, 462 U.S. at 438–40.

129. Under 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that the impoundments at issue, including those effectuated under the guise of "pocket rescission," violate

the Presentment Clause. Plaintiff States are further entitled to a permanent injunction preventing Defendants from maintaining the impoundments, including those effectuated under the guise of "pocket rescission," and through any actions implementing the impoundments.

## COUNT IV

**Administrative Procedure Act, 5 U.S.C. § 706(2)(A)–(C)**

**Unlawful Agency Action**

**(Against Agency Defendants and the United States)**

130. Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs.

131. The impoundments at issue in this case constitute final agency action subject to judicial review.

132. The APA requires courts to "hold unlawful and set aside" agency actions that are contrary to constitutional right or power; in excess of statutory authority or limitation; not in accordance with law; without observance of required procedure; or arbitrary and capricious. 5 U.S.C. § 706(2)(A)–(C).

133. Agency Defendants have taken unlawful actions by refusing to spend or obligate congressionally appropriated funds without authorization from Congress, thereby impounding those funds.

134. Defendants have caused, aided, or furthered these unlawful actions by refusing to fully apportion appropriations, unlawfully reserving funds, and/or otherwise preventing federal agencies from obligating or spending congressionally appropriated funds without authorization from Congress. These actions are unlawful. Defendants lack authority to prevent federal agencies from obligating funds appropriated by Congress for the purposes or within the periods designated by statute.

135. Through these actions, by unilaterally refusing to obligate or spend congressionally appropriated funds without authorization from Congress, Defendants acted

contrary to constitutional right and power. 5 U.S.C. § 706(2)(A). The Executive Branch lacks constitutional authority to unilaterally impound congressionally appropriated funds.

136. Defendants acted in excess of statutory authority or limitation by unilaterally refusing to obligate or spend congressionally appropriated funds without authorization from Congress. 5 U.S.C. § 706(2)(A). The Executive Branch lacks statutory authority to unilaterally impound congressionally appropriated funds or to refuse to fully apportion, obligate, and spend these funds for the purposes and within the time periods specified by statute. These actions are not in accordance with appropriations statutes. Pub. L. 119–4, 139 Stat. 9; Pub. L. 118–42, 138 Stat. 25; Pub. L. 118–47, 138 Stat. 460.

137. Through these actions, by unilaterally refusing to obligate or spend congressionally appropriated funds without authorization from Congress, Defendants acted without observance of required procedure, which required them to make the funds available.

138. Further, Defendants have created obligations against appropriated funds by using said funds to unlawfully modify the funding levels for specific programs in a manner reflecting the President's previously requested budget request. Because no appropriations are available for that purpose, the creation of those obligations is unlawful.

139. Under 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that the impoundments at issue, including those effectuated under the guise of "pocket rescission," are unlawful under the APA. Plaintiff States are further entitled to vacatur of the impoundments, including those effectuated under the guise of "pocket rescission," and any actions implementing or maintaining them pursuant to 5 U.S.C. § 706; all appropriate preliminary relief under 5 U.S.C. § 705; and a permanent injunction preventing Defendants from maintaining the impoundments, including through any actions implementing the impoundments.

**COUNT V**

**Administrative Procedure Act, 5 U.S.C. § 706(1)**

**Agency Action Unlawfully Withheld and Unreasonably Delayed**

**(Against Agency Defendants and the United States)**

140. Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs.

141. The APA authorizes a court to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

142. Under 31 U.S.C. § 1513(b)(2)(B), OMB is required to apportion appropriations no later than "30 days after the date of enactment of the law by which the appropriation is made available." OMB Defendants have failed to comply with their apportionment duties. OMB Defendants have failed to fully apportion multiple time-limited appropriations within the periods required by law. OMB Defendants have refused to take these actions in order to prevent federal agencies from obligating or spending appropriations and to instead impound these funds.

143. OMB Defendants have thus engaged in unlawful withholding and/or unreasonable delay of agency under 5 U.S.C. § 706(1) by refusing to fully apportion funds in the time mandated by statute.

144. Agency Defendants have a duty to obligate and spend appropriated funds for the purposes and within the periods established by statute. Agency Defendants have failed to comply with this duty. By impounding the funds at issue, Agency Defendants have delayed Plaintiff States' access to these congressionally appropriated funds.

145. Agency Defendants have thus engaged in unlawful withholding and/or unreasonable delay of agency under 5 U.S.C. § 706(1) by refusing without statutory authorization to obligate or spend congressionally appropriated funds for the purposes and within the periods established by statute.

146. Under 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that the impoundments at issue are unlawful under the APA and that Agency Defendants' actions implementing and maintaining the impoundments, including the refusal to

fully apportion or obligate and spend appropriated funds without statutory authorization, and impoundments effectuated under the guise of "pocket rescission," violate the APA because they constitute an unlawful withholding and/or unreasonable delay of agency action. Plaintiff States are further entitled to an order under 5 U.S.C. § 706(1) compelling the United States and Agency Defendants to fully apportion, obligate, and spend the unlawfully impounded funds that they unreasonably delayed and unlawfully withheld, a permanent injunction preventing Defendants from maintaining the impoundments, including through any actions implementing the impoundments, and a permanent injunction ensuring Defendants' compliance with required apportionment and obligation requirements in the future.

## COUNT VI

### *Ultra Vires* Executive Action

### (Against Agency Defendants and the United States)

147. Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs.

148. No administrative agency can take any action that exceeds its statutory authority. *FCC v. Cruz*, 596 U.S. 289, 301 (2022).

149. Federal courts possess the power in equity to grant injunctive relief "with respect to violations of federal law by federal officials." *Armstrong*, 575 U.S. at 326–27. The Supreme Court has repeatedly allowed equitable relief against federal officials who act "beyond th[e] limitations" imposed by federal law. *Larson v. Domestic & Foreign Com Corp.*, 337 U.S. 682, 689 (1949).

150. Agency Defendants acted without lawful authority when they refused to obligate and spend congressionally appropriated funds and thereby impounded those funds, including under the guise of "pocket rescission." OMB Defendants have caused, aided, or furthered these unlawful actions by refusing to fully apportion appropriations, unlawfully reserving funds, and/or otherwise preventing federal agencies from obligating or spending congressionally appropriated funds without authorization from Congress.

151. Under 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that the impoundments at issue are *ultra vires*. Plaintiff States are further entitled to a permanent injunction preventing Defendants from maintaining the impoundments, including through any actions implementing the impoundments.

**COUNT VII**

**Writ of Mandamus (28 U.S.C. §§ 1361, 1651)**

**(Against Agency Defendants)**

152. Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs.

153. To the extent no relief is available under the forgoing causes of action, Plaintiff States plead in the alternative that they are entitled to a writ of mandamus ordering Defendants to comply with their statutory and constitutional duties, including to apportion, obligate, and spend appropriated funds.

154. Agency Defendants are officers, employees, or agencies of the United States. "The district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. § 1361.

155. The relief sought as to Agency Defendants is necessary and appropriate to aid in the jurisdiction of this Court and agreeable to the usages and principles of law. "The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651.

156. Plaintiff States enjoy a clear and indisputable right to relief from the impoundments at issue.

157. OMB Defendants are violating a clear duty to act by failing to fully apportion funds that lawfully have been allocated by Congress.

158. Agency Defendants are violating a clear duty to act by refusing to obligate and spend congressionally appropriated funds without authorization from Congress, including under the guise of "pocket rescission."

159. To the extent no relief is available under the forgoing causes of action, no adequate alternative remedy exists to stop the extraordinary and ongoing harms to Plaintiff States being caused by Defendants' violations.

160. Under 28 U.S.C. §§ 1361, 1651, the Court should issue a writ of mandamus compelling the Agency Defendants to fully apportion, obligate, and spend the unlawfully impounded funds.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff States pray that this Court grant the following relief:

1. Declare that the impoundments, including the purported "pocket rescissions," and any actions to implement them, are unconstitutional and unlawful because they are *ultra vires* and violate the Constitution and the APA;

2. Declare that the preparation of the Special Message violated the Appropriations Clause;

3. Permanently enjoin Defendants, including their agents and anyone acting in concert or participation with Defendants, from implementing, instituting, maintaining, or giving effect to these impoundments, including the purported "pocket rescissions," by disrupting the required obligation of appropriated funds;

4. Under 5 U.S.C. § 706, vacate and set aside the impoundments, including the purported "pocket rescissions," and all actions taken to maintain or implement them;

5. Enter an order compelling the United States and Agency Defendants to fully apportion, obligate, and spend the unlawfully impounded funds that they unreasonably delayed and unlawfully withheld;

6. Issue a writ of mandamus compelling the Agency Defendants to fully apportion, obligate, and spend the unlawfully impounded funds;

7. Award Plaintiff States their reasonable fees, costs, and expenses, including

attorneys' fees, under 28 U.S.C. § 2412; and

8. Grant other such relief as this Court may deem proper.

Dated: September 30, 2026

Respectfully submitted,

**ROB BONTA**
Attorney General of California

By: /s/ Harald H. Kirn
HARALD H. KIRN (SBN 336448)
MARNIE G. GANOTIS
VANESSA K. ING
CHRISTOPHER J. KISSEL
JAY C. RUSSELL
ZELDA VASSAR
*Deputy Attorneys General*
KATHLEEN BOERGERS
R. MATTHEW WISE
*Supervising Deputy Attorneys General*
1300 I Street
Sacramento, CA 95814
(916) 210-6276
harald.kirn@doj.ca.gov

*Attorneys for Plaintiff State of California*

**AARON M. FREY**
Attorney General of Maine

By: /s/ Katherine W. Thompson
Katherine W. Thompson*
*Special Counsel*
Office of the Attorney General
6 State House Station
Augusta, ME 04333
Tel.: 207-626-8455
Fax: 207-287-3145
kate.thompson@maine.gov

*Attorneys for Plaintiff State of Maine*

**ANTHONY G. BROWN**
Attorney General of Maryland

By: /s/ Keith M. Jamieson
Keith M. Jamieson*
*Assistant Attorney General*
Office of the Attorney General
200 Saint Paul Place
Baltimore, MD 21202
(410) 576-6960
kjamieson@oag.maryland.gov

*Attorneys for Plaintiff State of Maryland*

**RAÚL TORREZ**
Attorney General of New Mexico

By: *<u>/s/ Anthony Juzaitis</u>*
Anthony Juzaitis*
Deputy Director
New Mexico Department of Justice
408 Galisteo Street
Santa Fe, NM 87501
ajuzaitis@nmdoj.gov

*Attorneys for Plaintiff State of New Mexico*

**DANA NESSEL**
Attorney General of Michigan

By: *<u>/s/ Neil S. Giovanatti</u>*
Neil Giovanatti*
Daniel J. Ping
*Assistant Attorneys General*
Michigan Department of Attorney General
525 W. Ottawa St.
Lansing, MI 48909
(517) 241-1050
PingD@michigan.gov
GiovanattiN@michigan.gov

*Attorneys for Plaintiff State of Michigan*

**DAN RAYFIELD**
Attorney General of Oregon

By: *<u>/s/ Coby Howell</u>*
Coby Howell*
*Senior Assistant Attorney General*
Ty Bair
*Senior Assistant Attorney General*
Oregon Department of Justice
100 SW Market St.
Portland, OR 97201
Telephone: (971) 673-1880
Fax: (971) 673-5000
Coby.Howell@doj.oregon.gov

*Attorneys for Plaintiff State of Oregon*

**AARON D. FORD**
Attorney General of Nevada

By: *<u>/s/ K. Brunetti Ireland</u>*
K. Brunetti Ireland
California Bar No. 316287
*Chief of Special Litigation*
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
kireland@ag.nv.gov

*Attorneys for Plaintiff State of Nevada*

*Pro hac vice application forthcoming